IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 10-00175-01-CR-W-FJG |
| | ) | |
| TERRY DIXON, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE AND MOTION TO SUPPRESS STATEMENT**

Before the court are Defendant's motions to suppress evidence and statement. Defendant moves the Court to suppress the firearm recovered from his residence on grounds that police entry into his home violated his Fourth Amendment rights. He also moves the Court to suppress his statement to Detective Toigo, arguing that the statement was obtained in violation of his Miranda rights and was involuntary due to police deception and coercion. For the following reasons, Defendant's motions will be denied.

## *I. BACKGROUND*

On June 6, 2010, Kansas City, Missouri Police Officers Beau Johnson and Charles Owen were on patrol duty and responded to a call for service concerning a dispute. The officers made contact with the victim, Nicole Smith, who stated she had left the residence without her keys after a dispute with Defendant but that their child remained inside. Officers Johnson and Owen approached the residence, knocked and, upon receiving no answer, concluded on one was there. Ms. Smith continued to insist Defendant was inside and told the officers she was afraid Defendant may

1

hurt or flee with their child. She additionally stated there was a firearm in the residence. Officers Johnson and Owen returned to the door of Defendant's residence a second time, this time accompanied by Ms. Smith. Once Defendant opened the door, Ms. Smith signaled for the officers to come inside. The officers entered and placed Defendant under arrest. Ms. Smith then went upstairs, retrieved a firearm and gave the firearm to Officers Johnson and Owen. Defendant was taken to police headquarters. The next day, Detective Toigo interviewed Defendant and Defendant confessed to possessing the firearm.

An indictment was returned on May 20, 2009, charging Defendant with being a felon in possession of a firearm. On August 12, 2010, Defendant filed a motion to suppress statement (Doc. No. 22) and a motion to suppress evidence (Doc. No. 23). The government responded to Defendant's motions on August 23, 2010 (Doc. Nos. 25, 26). I conducted an evidentiary hearing on September 2, 2010. The government appeared by Assistant United States Attorney Bruce Clark. Defendant was present, represented by appointed counsel Stephen Moss. The government called Kansas City, Missouri Police Department Officers Beau Johnson and Charles Owen as well as Kansas City, Missouri Police Department Detective Christopher Toigo to testify. The following exhibits were marked and admitted into evidence:

| | | |
|---|---|---|
| 09/02/10 | Government's Exhibit 1: | Miranda Waiver |
| 09/02/10 | Government's Exhibit 2: | DVD of Interrogation |
| 09/02/10 | Government's Exhibit 3: | Transcript of Interrogation |
| 09/02/10 | Government's Exhibit 4: | Photograph of pistol, signed and dated |
| 09/02/10 | Government's Exhibit 5: | Photograph of Nicole Smith, left side of face |
| 09/02/10 | Government's Exhibit 6: | Photograph of Nicole Smith, right side of face |
| 09/02/10 | Government's Exhibit 7: | Photograph of Nicole Smith, arm |
| 09/02/10 | Government's Exhibit 8: | Photograph of Nicole Smith, leg |
| 09/02/10 | Government's Exhibit 9: | Photograph of Nicole Smith, knee |
| 09/02/10 | Government's Exhibit 10 | Photograph of Nicole Smith, chest |

09/02/10 Defendant's Exhibit 1:     Police Report - June 6, 2010

On September 23, 2010, Defendant sought to supplement the record with an exhibit (Doc. No. 35). The government did not object. Accordingly, the following exhibit was admitted into the record:

09/02/10 Defendant's Exhibit 2:     ALERT log - June 6, 2010

(Doc. No. 36).

I held a teleconference concerning Defendant's Exhibit 2 on October 6, 2010 (Doc. No. 39). During the teleconference, I informed the parties that a supplemental suppression hearing would be set for October 20, 2010, to take testimony on whether an outstanding warrant existed for Defendant, or any of his aliases, on June 6, 2010. I advised the parties that the hearing would be cancelled if they were able to reach a stipulation before that time.

A supplemental suppression hearing was held on October 20, 2010. The government appeared by Assistant United States Attorney Bruce Clark. Defendant was present, represented by appointed counsel Stephen Moss. The government called Kansas City, Missouri Police Department Detective Darrell Reach and retired Kansas City, Missouri Police Department Detective Richard Neumann[1] to testify. The following exhibits were marked and admitted into evidence:

10/20/10 Government's Exhibit 1:    Alert Log File
10/20/10 Government's Exhibit 2:    Excerpt from Alert Log File
10/20/10 Government's Exhibit 3:    Parking Ticket
10/20/10 Government's Exhibit 4:    Radio Traffic Log

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearings, I submit the following findings of fact.

---

[1]As of the date of the supplemental suppression hearing, Richard Neumann had retired from the Kansas City, Missouri Police Department (10/20/10 Tr. at 25). Because he was still a detective on the date of the events in question, he will be referred to as "Detective Neumann" in this Report & Recommendation.

1. On June 6, 2010, Kansas City, Missouri Police Officers Beau Johnson and Charles Owen were on patrol duty (09/02/10 Tr. at 4). At approximately 10:34 p.m., they responded to a call for service concerning a disturbance at 1803 East 74th Terrace, Kansas City, Missouri (09/02/10 Tr. at 4, 22, 42; 10/20/10 Tr. at 7; 09/02/10 Def. Exh. 1; 10/20/10 Gvt. Exh. 4). The dispatch call was a "Priority 2," which indicates a regular disturbance (09/02/10 Tr. at 23).

2. When the officers arrived, they parked their car in front of the residence (09/02/10 Tr. at 4-5; 09/02/10 Def. Exh. 1). A vehicle at the end of the street flashed its lights at them (09/02/10 Tr. at 5). The officers walked to the car and made contact with Nicole Smith, the driver, and her father (09/02/10 Tr. at 5-6, 23).

3. Ms. Smith stated she had a verbal argument with Defendant in their residence at approximately 10:00 p.m. (09/02/10 Tr. at 6, 9, 24; 09/02/10 Def. Exh. 1). Defendant struck and choked her (09/02/10 Tr. at 6; 09/02/10 Def. Exh. 1). Ms. Smith told the officers she left the residence without getting her keys; their child remained inside (09/02/10 Tr. at 9, 43; 09/02/10 Def. Exh. 1).

4. Ms. Smith sustained significant injuries (09/02/10 Tr. at 6-7). Her face was swollen and bruised (09/02/10 Tr. at 7; 09/02/10 Gvt. Exh. 5, 6). Her right arm was bruised (09/02/10 Tr. at 7; 09/02/10 Gvt. Exh. 7). Ms. Smith's legs were also bruised and skinned (09/02/10 Tr. at 8; 09/02/10 Gvt. Exh. 8, 9). Her chest was scraped and she had bruising around her neck (09/02/10 Tr. at 8; 09/02/10 Gvt. Ech. 10). Officers Johnson and Owen both testified Ms. Smith's injuries were consistent with her account of the incident (09/02/10 Tr. at 6, 42).

5. Based on Ms. Smith's statement and his observation of her injuries, Officer Owen concluded

that Defendant had committed an arrestable offense and thus probable cause existed for his arrest (09/02/10 Tr. at 52).

6. Ms. Smith told the officers she was concerned about their child remaining inside the residence, fearing Defendant might hurt or flee with their child (09/02/10 Tr. at 9, 19, 43).

7. Ms. Smith gave the officers the name by which she knew Defendant, as well as an alias (09/02/10 Tr. at 10; 09/02/10 Def. Exh. 1). The officers performed a criminal history check on the ALERT system using Defendant's name and learned he had two other aliases (09/02/10 Tr. at 10, 20, 43, 54, 56, 58-59).

8. The ALERT system is a database containing information about individuals who have had law enforcement contact. The information contained within the ALERT system is obtained from self-reported information given by the individual contacted by law enforcement and contains any charges that may have resulted (10/20/10 Tr. at 41-42).

9. Computer records show that the information relayed to Officers Johnson and Owen's terminals on June 6, 2010 did not indicate Defendant had an outstanding warrant (10/20/10 Tr. at 4).

10. Officers Johnson and Owen also contacted Detective Neumann to request that he check whether Defendant had any prior domestic violence arrests and inquire about the level of charge for the offense that had allegedly occurred (10/20/10 Tr. at 27, 31-32). The officers provided Detective Neuman with the following information to conduct the check: "Charles Thompson, black male, 5/24/67" (10/20/10 Tr. at 29).

11. Using this information, Detective Neumann performed both a general search and a more specific search (10/20/10 Tr. at 4-5, 26, 33, 34; 10/20/10 Gvt. Exh. 2). The query resulted

in eight separate entries for "Charles Thompson" (10/20/10 Tr. at 14, 26, 34-35; 10/20/10 Gvt. Exh. 2).

12.  The first entry showed a "Charles E. Thompson" with an address of 1803 East 74th Street, the same address to which Officers Johnson and Owen were dispatched (10/20/10 Tr. at 15, 35). The entry showed a date of birth of May 24, 1967, which is the same date of birth given to Officers Johnson and Owen (10/20/10 Tr. at 16, 35). The entry also identified a black male with black hair, brown eyes with a weight of 230 pounds; these identifiers all matched Defendant (10/20/10 Tr. at 16-17, 35-36). There were no warrants associated with this entry (10/20/10 Tr. at 17, 36).

13.  Detective Neumann stated he then selected this entry to obtain an arrest history (10/20/10 Tr. at 29). He learned "Charles E. Thompson" had a simple assault case in 2009 that was dismissed as well as some traffic charges (10/20/10 Tr. at 29).

14.  The fourth entry showed a Kansas City, Missouri warrant for a non-moving violation issued in 1999 for "Charles R. Thomas" (10/20/10 Tr. at 14, 15, 18; 10/20/10 Gvt. Exh. 2). This entry listed an address of Orlando, Florida (10/20/10 Tr. at 18, 37; 10/20/10 Gvt. Exh. 2). There were no personal identifiers or date of birth listed (10/20/10 Tr. at 17, 36; 10/20/10 Gvt. Exh. 2). The warrant was issued from a parking ticket generated on June 14, 1999 (10/20/10 Tr. at 5-6, 18; 10/20/10 Gvt. Exh. 3).

15.  Detective Reach testified that the lack of identifiers was very typical for this type of warrant, as information would only have been obtained through the Department of Revenue (10/20/10 Tr. at 18). In this case, the name "Charles R. Thompson" would have been obtained from the vehicle registration (10/20/10 Tr. at 18).

16. Detective Neumann testified that, based on this search, he would have told Officers Johnson and Owen that there were several entries; one of the entries had a non-moving violation warrant, although it did not have any identifiers, and that the officers may want to look into it further (10/20/10 Tr. at 28, 30). Detective Neumann testified he never told Officers Johnson or Owen that this warrant was related to Defendant (10/20/10 Tr. at 37).

17. When a computer check reveals that an individual has an outstanding warrant for a non-moving violation, Kansas City, Missouri Police Department policy instructs officers to ask additional questions to determine whether the individual is the same individual named in the warrant (10/20/10 Tr. at 42).

18. Officers Johnson and Owen testified at the suppression hearing that they recalled a warrant corresponding to one of Defendant's names, although they could not recall which (09/02/10 Tr. at 10, 11, 20-21, 44, 48, 59).

19. After performing the background check on Defendant, Officers Johnson and Owen called for backup (09/02/10 Tr. at 11, 44). Once backup arrived, the officers approached the residence (09/02/10 Tr. at 12). Officers Johnson and Owen went to the front of the house and the other two officers went to the back door (09/02/10 Tr. at 12). The purpose of the approach was to investigate the assault (09/02/10 Tr. at 26-27). Officer Owen knocked loudly on the front door several times, identifying themselves as the police; Officer Johnson was on the side of the house looking in the windows (09/02/10 Tr. at 12, 26-27, 45). The officers thought they heard movement inside the house but the lights were off and nobody answered (09/02/10 Tr. at 12, 27).

20. Officers Johnson and Owen returned their car and drove to Ms. Smith's vehicle (09/02/10

Tr. at 13, 40). The backup officers left the area (09/02/10 Tr. at 13). Officers Johnson and Owen told Ms. Smith they were unable to make contact with Defendant, as it appeared nobody was inside the residence, and that they would have to complete a warrant application with regard to the assault (09/02/10 Tr. at 13, 20, 25). Officer Owen explained the process of obtaining an ex parte order of protection and put Ms. Smith in contact with a local shelter (09/02/10 Tr. at 45). The officers did not believe a warrantless entry into the residence would be justified by an imminent danger to the child because they did not think anyone was inside the house (09/02/10 Tr. at 20, 25, 52-53).

21.    Ms. Smith remained concerned about her child and insisted Defendant was inside the residence as his car was still parked in the driveway (09/02/10 Tr. at 13, 27, 45; 09/02/10 Def. Exh. 1). She also stated Defendant had a firearm in the residence and that he had been jailed previously (09/02/10 Tr. at 14). Ms. Smith told the officers she thought she could get Defendant to come to the door (09/02/10 Tr. at 14).

22.    Ms. Smith told Officers Johnson and Owen that she also lived in the residence (09/02/10 Tr. at 26, 43; 09/02/10 Def. Exh. 1). The officers never confirmed her address or whether she had keys to the residence (09/02/10 Tr. at 26).

23.    The officers agreed to let Ms. Smith try to make contact with Defendant (09/02/10 Tr. at 14, 28, 45; 09/02/10 Def. Exh. 1). Ms. Smith approached the door and knocked (09/02/10 Tr. at 14, 26; 09/02/10 Def. Exh. 1). Officers Johnson and Owen positioned themselves to her side so that there was not a visible police presence (09/02/10 Tr. at 14, 40, 45-46; 09/02/10 Def. Exh. 1). When Ms. Smith announced her presence, a male voice from inside asked "Why did you call the police?" (09/02/10 Tr. at 14, 28, 46; 09/02/10 Def. Exh. 1). This led

Officer Johnson to believe Defendant had been inside when he and Officer Owen first approached the residence as they had not seen anyone else enter the house in the interim (09/02/10 Tr. at 29, 32, 35-36).

24. Defendant came to the door (09/02/10 Tr. at 15). Ms. Smith stated she wanted to be let in and Defendant opened the door (09/02/10 Tr. at 15, 36). Ms. Smith stepped inside then signaled the officers to come inside the residence (09/02/10 Tr. at 15, 37, 46).

25. Officer Owen entered, grabbed Defendant's right wrist and told him he was under arrest (09/02/10 Tr. at 15, 37, 46, 47; 09/02/10 Def. Exh. 1). At this time, Defendant was no more than four feet from the front door (09/02/10 Tr. at 37). He never attempted to close the door (09/02/10 Tr. at 37).

26. Defendant began to yell and struggle so Officer Johnson also entered the residence to assist (09/02/10 Tr. at 15, 38, 46; 09/02/10 Def. Exh. 1). Defendant resisted by pulling away, jerking and pushing (09/02/10 Tr. at 16, 38, 46). He screamed that the police needed a warrant (09/02/10 Tr. at 47). Officer Johnson placed Defendant on the ground where he could be handcuffed for police safety (09/02/10 Tr. at 16, 46-47; 09/02/10 Def. Exh. 1).

27. After Defendant was arrested, Ms. Smith went to the kitchen and stated that was where Defendant usually kept the firearm (09/02/10 Tr. at 16, 48; 09/02/10 Def. Exh. 1). She did not locate a firearm and proceeded to go upstairs to get her child (09/02/10 Tr. at 16). When Ms. Smith came back downstairs with her child, she had a firearm inside a plastic bag (09/02/10 Tr. at 16, 47; 09/02/10 Def. Exh. 1).

28. When Officers Johnson and Owen left the residence, Ms. Smith remained (09/02/10 Tr. at 26).

29. Kansas City, Missouri Police Detective Christopher Toigo interviewed Defendant on June 7, 2010 (09/02/10 Tr. at 61).  The interview took place at police headquarters (09/02/10 Tr. at 61; 09/02/10 Gvt. Exh. 1).  Detective Toigo checked Defendant out of his cell and escorted him to the detention unit on the second floor (09/02/10 Tr. at 72).  Detective Toigo did not recall having a conversation with Defendant on the way to the detention unit (09/02/10 Tr. at 73).

30. At the time of the interview, Defendant was 43 years old (09/02/10 Gvt. Exh. 1; 09/02/10 Gvt. Exh. 2).  He had completed the 12th grade (09/02/10 Gvt. Exh. 1).

31. Detective Toigo described the Miranda waiver form as a "formality" and as "just some paperwork" (09/02/10 Tr. at 73; 09/02/10 Gvt. Exh. 2).  Detective Toigo testified that he did not use those terms to minimize the importance of the form (09/02/10 Tr. at 74).

32. Defendant asked Detective Toigo if stopping the interview and requesting a lawyer would "mess up" their relationship (09/02/10 Tr. at 73; 09/02/10 Gvt. Exh. 2).  Detective Toigo responded that if Defendant told him he was done talking and wanted a lawyer, Detective Toigo would respect his decision and stop the interview (09/02/10 Gvt. Exh. 2).

33. Detective Toigo informed Defendant of his Miranda rights at 9:10 a.m., approximately one and a half minutes after Defendant entered the detention unit (09/02/10 Gvt. Exh. 1; 09/02/10 Gvt. Exh. 2).  He did so by reading Defendant his rights (09/02/10 Gvt. Exh. 2).  Defendant verbally expressed an understanding of his rights and signed the Miranda waiver at 9:11 a.m. (09/02/10 Gvt. Exh. 1; 09/02/10 Gvt. Exh. 2).

34. The interview began at 9:11 a.m. and concluded at 10:06 a.m. (09/02/10 Gvt. Exh. 1).

35. During the interview, Detective Toigo sat to Defendant's side (09/02/10 Tr. at 74; 09/02/10

Gvt. Exh. 2). Detective Toigo used the technique of being sympathetic to Defendant (09/02/10 Tr. at 74).

36. The interview was videotaped; however, Detective Toigo told Defendant it was not being videotaped (09/02/10 Tr. at 64, 77; 09/02/10 Gvt. Exh. 2). Detective Toigo explained that in his experience, individuals tend to withhold information and not tell the truth when they are being videotaped (09/02/10 Tr. at 64). Detective Toigo's training did not require him to tell Defendant he was being videotaped (09/02/10 Tr. at 64).

37. Detective Toigo's questioning was aimed at establishing possession of the firearm that was recovered from 1803 East 74th Terrace (09/02/10 Tr. at 72). His goal was to obtain a truthful statement about the firearm (09/02/10 Tr. at 75, 79-80). Detective Toigo did not inform Defendant of his goal prior to the interview (09/02/10 Tr. at 72).

38. Defendant told Detective Toigo he was "supposed to see the judge pretty soon" (09/02/10 Gvt. Exh. 2). Detective Toigo believed Defendant was talking about appearing before the domestic violence judge; he did not know Defendant would be brought before a federal judge (09/02/10 Tr. at 76-77). Detective Toigo responded he could only answer Defendant's questions if he signed the <u>Miranda</u> waiver form (09/02/10 Tr. at 75; 09/02/10 Gvt. Exh. 2). Detective Toigo testified that this was not accurate, as he could have answered Defendant's questions (09/02/10 Tr. at 76).

39. Detective Toigo asked Defendant if Defendant could possess a firearm (09/02/10 Tr. at 65). He implied that Defendant's age permitted him to have a firearm, by asking Defendant why he would get time for possessing a gun (09/02/10 Tr. at 77-78; 09/02/10 Gvt. Exh. 2).

40. Detective Toigo implied Defendant could help himself by being honest (09/02/10 Tr. at 77;

09/02/10 Gvt. Exh. 2). Detective Toigo believes suspects who confess are treated more leniently if they are honest (09/02/10 Tr. at 77). Detective Toigo testified that, based upon his experience, it is a correct statement that the judicial system does not like liars (09/02/10 Tr. at 66).

41. During the interview, Defendant asked for and received a cigarette and two glasses of water (09/02/10 Tr. at 67-68; 09/02/10 Gvt. Exh. 1).

42. Detective Toigo told Defendant he thought Defendant was a good parent (09/02/10 Tr. at 78; 09/02/10 Gvt. Exh. 2). Detective Toigo testified he believed Defendant loves his son and that anyone who loves their child and is willing to try and better the livelihood of their child is a good parent (09/02/10 Tr. at 78).

43. Defendant became upset off and on throughout the interview and cried at points (09/02/10 Tr. at 78; 09/02/10 Gvt. Exh. 2).

44. Detective Toigo told Defendant that Defendant was different than other individuals he talked to on a daily basis (09/02/10 Tr. at 78-79; 09/02/10 Gvt. Exh. 2). Detective Toigo testified that this was a true statement, as he thought Defendant was trying to do the right thing by telling the truth (09/02/10 Tr. at 79).

45. Detective Toigo told Defendant that "without hope you don't have anything else and that's one thing Jesus Christ gave us" (09/02/10 Tr. at 79; 09/02/10 Gvt. Exh. 2). Detective Toigo testified he is a Christian and believes in God, and that this was a fair and accurate statement (09/02/10 Tr. at 79).

46. Detective Toigo testified he can lie to suspects (09/02/10 Tr. at 80).

47. Approximately eighteen minutes into the interview, Defendant confessed to possessing the

firearm (09/02/10 Tr. at 80; 09/02/10 Gvt. Exh. 2). He stated he lived next to a drug house

and obtained the gun for protection (09/02/10 Tr. at 80; 09/02/10 Gvt. Exh. 2). People had

previously knocked on his door at 1:00 or 2:00 in the morning looking for drugs; however,

the neighbor had moved and Defendant stated he no longer needed the firearm (09/02/10 Tr.

at 81; 09/02/10 Gvt. Exh. 2).

48.    Detective Toigo asked Defendant to describe the firearm (09/02/10 Tr. at 69; 09/02/10 Gvt.

Exh. 2). He also showed Defendant a photograph of the firearm and asked Defendant to

initial and date the photograph (09/02/10 Tr. at 70; 09/02/10 Gvt. Exh. 2). Defendant

complied (09/02/10 Gvt. Exh. 4).

### III. LEGAL ANALYSIS

Defendant challenges the constitutionality of the officers' entry into his home on June 6,

2010 as well as the June 7, 2010 statement he gave to Detective Toigo. Each will be addressed in

turn.

### A. PHYSICAL EVIDENCE

Defendant maintains that the firearm recovered from his home was obtained in violation of

his rights under the Fourth Amendment to the United States Constitution. Specifically, Defendant

argues that Ms. Smith's consent to enter his home was not effective in light of his lack of consent.

Defendant relies on Georgia v. Randolph for the position that the consent of a co-tenant is not

effective against a non-consenting occupant who is physically present. 547 U.S. 103 (2006).

The Fourth Amendment generally prohibits the warrantless entry of an individual's home as

unreasonable. Id. at 109. One exception that justifies entry without a warrant is consent. It is well

established that the police may enter a defendant's home "with the voluntarily given consent of the

defendant or with the consent of a third party who shares 'common authority over the premises or effects.'" United States v. Almeida-Perez, 549 F.3d 1162, 1169 (8th Cir. 2008)(quoting United States v. Matlock, 415 U.S. 164, 170 (1974)). The consent of a third party can be invalidated, however, by the "express refusal of consent by a physically present resident." Randolph, 547 U.S. at 120. See also Almeida-Perez, 549 F.3d at 1169; United States v. Hudspeth, 518 F.3d 954 (8th Cir. 2008).

Examination other courts' interpretations of what constitutes "express refusal" is persuasive. The Tenth Circuit has held that a defendant did not expressly refuse consent by barricading himself inside his home. United States v. McKerrell, 491 F.3d 1221, 1226 (10th Cir. 2007). In United States v. Sims, 435 F. Supp. 2d 542, 545 n.5 (S.D. Miss. 2006), however, the Southern District of Mississippi found that closing the door on a police officer's face "was a clear, express refusal." Under circumstances factually similar to the instant case,[2] the Sixth Circuit held that entry into a defendant's home was unconstitutional based on the defendant's statement that he had thrown his wife out of the house and that neither she nor the police nor his wife had a right to be in there. United States v. Tatman, No. 09-3117, 2010 WL 3724593 at *7, *9 (6th Cir. Sept. 13, 2010). The Northern District of Texas similarly found express refusal where a defendant told police officers that they did not have a search warrant and could not come into his house. United States v. Davis, No. 3:07-CR-00124-B, 2008 WL 80755 at *6 (N.D. Tex. Jan. 8, 2008). In United States v. Henderson, the Northern District of Illinois found that a defendant expressly refused consent by telling police, "Get the f*** out of my house." No. 04 CR 697, 2006 WL 3469538 at *1-*2 (N.D. Ill. Nov. 29,

---

[2] Tatman involved police responding to a domestic violence call from the defendant's wife. 2010 WL 3724593 at *1. Police arrived at the defendant's house to place him under arrest, but no one answered the door. Id. When police informed the defendant's wife of these events, she agreed to let them into the house. Id.

2006).

In this case, Officers Johnson and Owen did not make contact with Defendant the first time they went to his door and knocked. The officers told Ms. Smith that no one appeared to be home. Ms. Smith insisted Defendant was inside the home, so the officers agreed to let her try to contact Defendant. Officers Johnson and Owen accompanied Ms. Smith to the door and stood out of sight as she knocked on the door and announced her presence. Defendant immediately asked, "Why did you call the police?". Once Defendant opened the door for Ms. Smith, Ms. Smith signaled the officers to enter the residence. Officer Owen stepped inside Defendant's home and grabbed Defendant's wrist. Defendant began to yell and struggle, and stated that the officers needed a warrant. I find that Defendant's actions constitute an express refusal of consent and, thus, invalidate Ms. Smith's consent.

Having found that consent did not justify the warrantless entry into Defendant's home, it is now necessary to consider whether any other exceptions may apply. Exigent circumstances is a second exception to the warrant requirement. United States v. Janis, 387 F.3d 682, 687 (8th Cir. 2004). The Eighth Circuit has "long held the 'view that legitimate concern for the safety of individuals may constitute "exigent circumstances" justifying warrantless entries and searches.'" Id. (quoting United Sates v. Antwine, 873 F.2d 1144, 1147 (8th Cir. 1989)).

Here, Ms. Smith was no longer in the house when she reported the assault (see Randolph, 547 U.S. at 119); she was safely inside a vehicle with her father when Officers Johnson and Owen arrived. Although Officers Johnson and Owen testified at the suppression hearing that they did not believe an imminent danger to the child would justify a warrantless entry, particular attention must be paid to the timing of events. Officers Johnson and Owen's position that a warrantless entry was

not justified was premised on their belief that no one was inside the home. Consistent with this belief, they explained the process of obtaining an ex parte order of protection to Ms. Smith and told her they would have to complete a warrant application with regard to the assault. However, when Officers Johnson and Owen returned to the Defendant's door the second time, this time with Ms. Smith, they heard Defendant's voice and saw Defendant when he opened the door. Upon learning that Defendant was, in fact, at home, exigent circumstances justified a warrantless entry. Specifically, Defendant and Ms. Smith had been involved in a domestic assault less than two hours prior during which Ms. Smith sustained significant injuries. Their child remained inside the home. Ms. Smith had told the officers she feared Defendant may hurt their child and that Defendant had a firearm in the house. Given these circumstances, Officers Johnson and Owen's warrantless entry into Defendant's home was constitutionally permissible and Defendant's motion to suppress evidence should be denied.

Even if the Court were to find that the exigent circumstances exception to the warrant requirement does not apply to the facts of this case, the firearm recovered from Defendant's home should not be suppressed. Based on the evidence adduced at the suppression hearings, an issue exists as to whether there was an outstanding warrant for Defendant's arrest. Officers Johnson and Owen both testified that a warrant corresponded to one of Defendant's names. By contrast, Detective Reach testified that records containing the information displayed on Officers Johnson and Owen's computer screens did not show an outstanding warrant. Detective Neumann testified he never definitively told the officers Defendant had a warrant. Resolution of this issue is not necessary, however, to reach a conclusion under the facts of this case.

An officer's reasonable belief that a warrant exists can justify an arrest even when it is

discovered that no warrant exists. <u>Arizona v. Evans</u>, 514 U.S. 1, 14-16 (1995). This is so even when police personnel were responsible for the error. <u>Herring v. United States</u>, 129 S. Ct. 695, 701 (2009). <u>See</u> <u>also</u> <u>United States v. Shareef</u>, 100 F.3d 1491, 1503 (10th Cir. 1996)(holding conclusion that the defendant had an outstanding warrant was reasonable where the officer accurately confirmed the last name, date of birth, sex and race); <u>United States v. Espinosa</u>, 827 F.2d 604, 609 (9th Cir. 1987)(holding arrest was reasonable based on officers' belief that the defendant had an outstanding warrant despite discrepancies between the birth date and height and weight identifiers); <u>United States v. Altman</u>, No. 09-CR-20010, 2009 WL 4065047 (C.D. Ill. Nov. 20, 2009)(finding officers "made good faith arrest on warrant that later turned out to be for someone else"). Even when a Fourth Amendment violation has occurred, the exclusionary rule -- which should be a last resort -- does not necessarily apply. <u>Herring</u>, 129 S. Ct. at 700. Instead, the "extent to which the exclusionary rule is justified . . . varies with the culpability of the law enforcement conduct." <u>Id</u>. at 702. "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." <u>Id</u>. "Evidence should be suppressed only if it can be said that the law enforcement officers had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." <u>Id</u>. at 701 (<u>quoting</u> <u>Illinois v. Krull</u>, 480 U.S. 340, 348-49(1987)(<u>quoting</u> <u>United States v. Peltier</u>, 422 U.S. 531, 542 (1975)).

Under the facts of this case, I find that Officers Johnson and Owen's belief that Defendant had an outstanding warrant to be reasonable. When the officers called Detective Neumann to perform a check on Defendant, they gave him the following information: "Charles Thompson, black male, 05/24/67." Detective Neumann's check revealed eight separate entries for "Charles

Thompson." Detective Neuman told Officers Johnson and Owen there were several entries, one of which had a non-moving violation warrant. This entry did not contain any identifiers, so Detective Neumann told the officers they would need to conduct further inquiry to determine if the warrant was related to Defendant.

When Officers Johnson and Owen made contact with Defendant at the door of his home, they were unable to obtain any additional information from Defendant as Defendant immediately began to yell and struggle. These circumstances, combined with the officers' knowledge that Defendant used aliases, the lack of identifiers being common for non-moving violation warrants, and the fact that the information contained within the ALERT database is only as good as the information provided by the individuals contacted by law enforcement, Officers Johnson and Owen's belief that Defendant had an outstanding warrant was reasonable. Furthermore, there was no evidence presented at either suppression hearing that any law enforcement error was deliberate, reckless, grossly negligent or a product of recurring or systemic negligence. Defendant's motion to suppress evidence should, accordingly, be denied.

## B. STATEMENTS

Defendant maintains that his June 7, 2010 statement to police should be suppressed as being obtained in violation of his Miranda rights and his rights under the Fifth Amendment to the United States Constitution. Specifically, Defendant argues he waived his Miranda rights as the result of police deception and trickery.

In order to use statements made by a defendant during custodial interrogation, the government must prove that the law enforcement officer to whom the statement(s) were made first informed the defendant of his right against self-incrimination and obtained a waiver from the

defendant of that right. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). When evaluating whether custodial statements are admissible, a court must engage in a two-step analysis. First, the defendant's waiver must have been voluntarily, knowingly and intelligently given in order to be valid. <u>United States v. Jones</u>, 23 F.3d 1307, 1313 (8th Cir. 1994). If the waiver is found valid, the court must then ascertain whether the defendant voluntarily made the statements at issue. <u>Colorado v. Connelly</u>, 479 U.S. 157, 169 (1986).

## 1.  <u>Voluntary, Knowing and Intelligent Waiver</u>

_____A waiver is "voluntary" if it is the defendant's "free and deliberate choice," and made without "intimidation, coercion or deception." <u>Id.</u> at 170. For the waiver to be "knowing" and "intelligent," a defendant must have a "full awareness" of the nature of his right against self-incrimination and understand the consequences of waiving that right. <u>Moran v. Burbine</u>, 475 U.S. 412, 420 (1986). The court looks to the totality of the circumstances surrounding the defendant's interrogation in determining whether his waiver was valid. <u>Id.</u> at 421. Relevant factors include: (1) the defendant's background, experience and conduct, <u>id.</u>; (2) whether the defendant expressly stated that he was waiving his rights, <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979); and (3) the length of time after the waiver that the defendant made the statements, <u>see</u> <u>Miranda</u>, 384 U.S. at 476.

In this case, Defendant was 43 years old, had completed the 12th grade, and had prior law enforcement contact. Detective Toigo read Defendant his Miranda rights and Defendant verbally expressed understanding. Defendant expressly waived his rights by signing a written <u>Miranda</u> waiver approximately one and a half minutes after entering the detention unit. Defendant confessed to possessing the firearm approximately eighteen minutes later. Defendant argues his <u>Miranda</u> waiver was obtained through police deception and trickery. He contends Detective Toigo: (1) lied

about the existence of a recording device; (2) falsely stated Defendant had a right to know if he was being recorded; (3) described the <u>Miranda</u> waiver as "paperwork" and a "formality"; (4) falsely stated he could only answer Defendant's questions if he signed the waiver; and (5) implied Defendant needed to sign the waiver in order to appear before a judge with the authority to release him.

Defendant's waiver was not rendered involuntary by Detective Toigo's statements that the interview was not being videotaped or that Defendant needed to execute the waiver before Detective Toigo could answer Defendant's questions or Defendant could appear before a judge. The Eighth Circuit has held that false statements by police do not amount to unconstitutional coercion. <u>Evans v. Dowd</u>, 932 F.2d 739, 742 (8th Cir. 1991). Likewise, <u>Miranda</u> waivers are not rendered involuntary alone when law enforcement officers refer to a suspect's Miranda rights as "just a formality." <u>United States v. Syslo</u>, 303 F.3d 860, 863, 866 (8th Cir. 2002). Defendant's motion to suppress statements should be denied on these grounds.

## 2. <u>Voluntary Statements</u>

A statement is voluntarily given when, in light of the totality of the circumstances, the defendant made the statement on his own accord rather than as a result of succumbing to improper pressure from law enforcement officers. <u>See</u> <u>Davis v. North Carolina</u>, 384 U.S. 737, 739 (1966). In determining if a statement was voluntarily given, courts consider whether the statement "was extracted by threats, violence or direct or implied promises, such that the defendant's 'will [was] overborne and his capacity for self-determination critically impaired.'" <u>United States v. Kilgore</u>, 58 F.3d 350, 353 (8th Cir. 1995)(citations omitted); <u>see</u> <u>also</u> <u>United States v. Lebrun</u>, 363 F.3d 715, 724 (8th Cir. 2004).

"Any questioning 'of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime.'" Evans v. Dowd, 932 F.2d 739, 741-42 (8th Cir. 1991)(quoting United States v. Jorgensen, 871 F.2d 725, 729-30 (8th Cir. 1989)); see also Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993). "Questioning tactics such as . . . deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." United States v. Coleman, No. 8:07CR21, 2008 WL 187607 at *2 (D. Neb. Jan. 18, 2008)(citing United States v. Ingle, 157 F.3d 1147, 1150 (8th Cir. 1998)); see also United States v. Astello, 241 F.3d 965, 967 (8th Cir. 2001); Jenner, 982 F.2d at 334.

In this case, Defendant contends his statement should be suppressed as being involuntarily obtained, arguing Detective Toigo falsely informed him that his honesty would constitute a basis for leniency and improperly appealed to his religious beliefs. I disagree.

The totality of the circumstances demonstrate Defendant's statement was voluntarily given. Defendant was questioned for less than an hour. He confessed to possessing the firearm approximately eighteen minutes after the interview began. During the interview, he was not mistreated; rather, Detective Toigo gave Defendant a cigarette and two glasses of water. Defendant never told Detective Toigo he wanted the interview to end.

With respect to Defendant's allegation of promises of leniency, my review of the interview reveals that Detective Toigo did not make any promises. In fact, Detective Toigo told Defendant on more than one occasion that he did not know what was going to happen to Defendant. Detective Toigo did imply that Defendant could help himself by being honest. He testified at the suppression

hearing that his experience has proven this to be a true statement. As stated by the District of Nebraska in <u>Coleman</u>, "[f]or a law enforcement officer to imply that a defendant's cooperation may favorably impact the defendant is more in the nature of a realistic assessment of a defendant's predicament - representing a choice between unpleasant alternatives - than a trick or a ruse." 2008 WL 187607 at *3. Additionally, my review of the interview does not reveal Detective Toigo's appeals to Defendant's religious beliefs caused Defendant's will to be overborne or critically impaired his capacity of self-determination. <u>See</u> <u>Jenner</u>, 982 F.2d 329; <u>United States v. Scaggs</u>, 377 Fed. Appx. 653, 656 (9th Cir. 2010)("An appeal to a suspect's religious beliefs does not render a confession involuntary unless his will was overborne."). Defendant's motion to suppress his statement to Detective Toigo should be denied.

## IV.  CONCLUSION

For the above-stated reasons, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's Motion to Suppress Evidence and Motion to Suppress Statement.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 18, 2010